PRITCHARD & ABBOTT ET AL V.
PATRICK H. MCKENNA, ET AL

No. A-8297   Decided October 3, 1961
Rehearing Denied November 8, 1961
350 S.W. 2d 333

618

*Fulbright, Crooker, Freeman, Bates & Jaworski,* Houston, *B. J. Bradshaw,* Houston, with above firm, for Pritchard & Abbott and others.

*Markwell, Stubbs, Decker & Dalehite,* Galveston, *Graves, Dougherty & Gee,* Austin, for Galveston County and others.

*Tramonte & Urbani,* Galveston, and *Leo Brewer,* San Antonio, for Patrick H. McKenna, et al.

CULVER, Justice.

This suit was brought by McKenna and certain other taxpaying citizens of Galveston County praying that a certain contract entered into by and between Galveston County acting through its Commissioners Court and the partnership of Pritchard & Abbott, an appraisal firm, be declared void and that the Commissioners Court and each member thereof be enjoined from paying to Pritchard & Abbott any sums of money that might be due under the terms of the contract. The trial court held the contract null and void and issued the injunction as prayed for.

The Court of Civil Appeals affirmed, 343 S.W. 2d 752, holding (1) that the Commissioners Court in entering into this contract usurped the functions, duties and prerogatives of the County Assessor and Collector and therefore that the contract is ultra vires the powers of the Commissioners Court; (2) that under the contract Pritchard & Abbott were employed to provide "a system for the Tax Assessor" as defined by Article 7264a, Vernon'a Annotated Civil Statutes, and since the contract was not joined in or approved by the State Comptroller as required by that article it is invalid.

Admittedly the Commissioners Court is not expressly clothed with constitutional or statutory authority to contract for the services detailed in this agreement, but we think that authority is implied from the powers that have been expressly granted to and the duties imposed upon this body by law.

Section 18, Article V, State Constitution, provides in part: "The County Commissioners so chosen, with the County Judge as presiding officer, shall compose the County Commissioners Court, which shall exercise such powers and jurisdiction over all county business, as is conferred by this Constitution and the laws of the State, or as may be hereafter prescribed." The Constitution also provides that "Taxation shall be equal and uniform. All property in this State, whether owned by natural persons or corporations other than municipal, shall be taxed in proportion to its value, which shall be ascertained as may be provided by law." Section 1, Article VIII. The County Commissioners Court is constituted as a board of equalization for the County. Section 18, Article VIII, State Constitution.

The law places upon the County Equalization Board a heavy responsibility and of necessity it must be given considerable power to carry out this responsibility. The Board is charged with the inspection, correction, equalization and approval of

assessments made by the County Assessor. The Board is expressly authorized to require the production of relevant books and papers and to summons persons and examine them under oath in order to ascertain the value of the taxable property and to raise or lower the same as may be warranted. Article 7206. The statute requires that when the Commissioners Court convenes as a board of equalization each member of the court, including the County Judge, shall take an oath that he will faithfully perform the duties imposed upon him to see that all property subject to taxation shall stand on the tax rolls at its true cash market value, Article 7215, and if any member of that Board shall knowingly fail or refuse to fix the value of property rendered for taxation in compliance with the laws of the State that failure or refusal shall constitute malfeasance in office and shall be cause for his removal. Article 7216.

Respondents say the contract calls for and results in taking over the functions of the Tax Assessor by the Commissioners Court and that this conclusion is borne out by the evidence introduced in the case.

■ So far as the consideration of the evidence introduced in the case is concerned the Court of Civil Appeals, we think, correctly reviewed the provisions of the contract as being clear and free of ambiguity. That being true its validity vel non is to be determined from an inspection of that document alone without the aid of any other evidence and without taking into account any acts and conduct of the parties in attempting to comply with the terms of this agreement. The following cases cited by the Court of Civil Appeals do not hold otherwise. Lone Star Gas Company v. X-Ray Gas Company, 139 Tex. 546, 164 S.W. 2d 504; Gulf Coast Water Company v. Hamman Exploration Company, Tex. Civ. App., 160 S.W. 2d 92, writ refused, and City of Athens v. Andrews, Tex. Civ. App., 231 S.W. 2d 928, writ refused.

We are fully in accord with respondents in pointing out, as they do, that the County and the County Commissioners Court are not synonymous nor are they one and the same. We quite agree that the County Commissioners Court is not charged with the management and control of all of the County's business affairs. Each of the various elected officials, including the Assessor-Collector, has the sphere that is delegated to him by law and within which the Commissioners Court may not interfere or usurp. But that is not to say that the functions of the Board

of Equalization and those of the Assessor-Collector are so diverse that information may not be lawfully contracted for and obtained by the Equalization Board because it may likewise be of aid to the Assessor in the performance of his duties. It is the duty of the Assessor as well to determine the value of all taxable property in the county.

The statutory procedure outlined in Article 7206 is that the Commissioners Court shall convene as a board of equalization on the second Monday in May of each year or at least before the first day of June. At that time the Assessor is to bring before the Board his assessment list for inspection and correction if necessary. After the Board has examined, corrected and approved the Assessor's list, the Assessor prepares the tax roll and furnishes copies to the Tax Collector, the State Comptroller and to the County Clerk.

Many thousand pieces of real property are located in Galveston County, including residential and business structures of various kinds, vacant lands, harbor facilities, oil properties and installations and other types. Without expert assistance the Board could not begin to carry out its functions and sworn obligations and a thorough appraisal of all taxable property is a task that would necessarily involve months of preparation. We think it is of no moment that the contract called for this work to be done prior to the meeting of the Equalization Board and to the presentation to the Board of the assessment list made up by the Assessor.

The contract is set out in full in the opinion of the Court of Civil Appeals and will not here be duplicated. Actually the opening paragraph of the contract sets forth the substance of the services to be rendered by Pritchard & Abbott as well as the benefit to be gained by the County from those services as follows:

"That, WHEREAS, the County of Galveston, State of Texas, acting by and through its Commissioners' Court, has determined that there is a necessity for, and that it will be to the best interest of said County and its citizens generally, to employ experts, skilled in the appraisal and valuation of oil and/or gas producing properties, industrial properties, and lands and buildings, and to make a permanent record of all lands and buildings within the County, so that all properties may be properly valued for the purpose of taxation and values thereof equalized."

Respondents seem to concede that if this contract were restricted to the appraisal of oil and gas or other properties that required special skill and experience "not possessed by the ordinary person" the contract would not be invalid. This would be true, they say, because as a matter of "sheer necessity" in that field skilled appraisers must be employed. We do not agree with that reasoning. The matter of skill required to appraise different kinds of property is one of degree. The appraisal function not only requires an expert in the field of oil and gas, but also an expert in the field of what may be said to be ordinary real estate values. "The ordinary person" is no more qualified to value real estate than he is to value oil and gas properties. Each requires special training, experience and qualifications.

The fact that there may be more qualified experts in the field of ordinary real estate values than in that of oil producing properties and installations cannot be material in determining the power of the Board of Equalization to retain expert advice. To say that the Board may hire experts in one field but not in another is borne out neither by logic nor by the authorities.

In Roper v. Hall, Tex. Civ. App., 280 S.W. 289, no writ history, the Commissioners Court was held to have implied power to contract with an individual for compilation of data for its use while sitting as a board of equalization in determining the taxable value of oil and gas properties in the county. The court held "The services contracted to be rendered called for information and experience not possessed by the ordinary person. So far as they affected the discovery, assessment, and valuation of unrendered oil properties, they could not have been performed by the County Assessor unless he possessed extraordinary information and experience along the required lines." Respondents say this rule should not be extended so as to cover all of the real estate in the county. This apparently is based on the theory that the Tax Assessor is always to be considered as a qualified expert as to the usual run of real properties. Even if this premise be true which it is not, the Board of Equalization is not bound by the values fixed by the Assessor no matter how expert he may be. We fail to see why the Board may not seek independent expert information as to all forms of taxable property, otherwise the members of the Board would not be in position to revise or correct the Tax Assessor's list but would be derelict in their duty. There is nothing in the Roper case to indicate that the court intended to limit such a contract to the appraisal of oil and gas interests.

As to the exact question before us the authorities are somewhat meager and not wholly decisive.

In Federal Royalty Company v. State, Tex. Civ. App., 42 S.W. 2d 670, suit was brought by the State of Texas to recover taxes and foreclose tax lien on a royalty interest in oil and gas lands. The company defended on the ground that the assessment was void because not made by the County Assessor. The County had therefore employed an expert to secure and furnish to it information as to oil and gas properties in the county for use in equalizing assessments. The court concluded that both the Assessor and the Board could make use of this information and that such practice did not void the assessment. In passing upon this question, probably by way of dictum, the court observed that "where, as in this State, no express authority is given to employ such expert aid, the power to do so is implied, and the expedience of doing so is within the discretion of the Commissioners Court." It is evident that the company in that case did not contend that the contract was illegal. The decision is rendered less authoritative also because this court in affirming did not discuss that matter, but disposed of the case by holding that the royalty interests in question was taxable as real estate.[1]

■ In Whelan v. State, 155 Tex. 14, 282 S.W. 2d 378, the Commissioners Court employed an expert to assist in arriving at the value of producing oil and gas properties. In setting aside the assessments we observed that "the enlistment of expert assistance in such matters is not to be condemned." We are further reinforced in our conclusions that the Commissioners Court has the implied power to contract for expert services by the proviso contained in Article 7212. The Legislature set out in that article that the Commissioners Court "after hearing the evidence, shall fix the value of such property in accordance with the evidence so introduced and as provided for in the preceding Article, and their action in such case or cases shall be final; provided, however, that if the Commissioners' Court of any county who contracts with or employs any individual, firm, or corporation to compile taxation data, the compensation for such individual, firm or corporation, may be paid on a pro rata basis from each county fund receiving any taxes derived from such valuation." The implication is patent, we think, that the "evidence" referred to in the article may include expert advice contracted and paid for and that such contract is within the authority of the Board.

---

1. Federal Royalty Company v. State, 124 Tex. 290, 77 S.W. 2d 1021.

Respondents in their brief and oral argument frequently cite and heavily rely upon the decisions in Marquart v. Harris County, Tex. Civ. App., 117 S.W. 2d 494, writ dismissed, and White v. McGill, 131 Tex. 231, 114 S.W. 2d 860. They single out Marquart as the best reasoned and leading authority for their contention that the Commissioners Court did not have the authority to make the contract in question. But what the Marquart decision stands for is the proposition that the contract made by the Commissioners Court of Harris County was "in connection with the collection of delinquent taxes within the meaning of Articles 7264a and 7335a, Vernon's Ann. Civ. Stats." Marquart follows White v. McGill that struck down a Commissioners Court contract by reason of the "tax ferret" provisions in which the so-called tax ferrets were to discover and point out property that had escaped taxation and were to be paid a fee of 15 per cent of the amount of taxes collected on personal property discovered by them.

The Court of Civil Appeals has correctly rejected this argument holding that the contract between Galveston County and Pritchard & Abbott was not entered into in connection with the collection of delinquent taxes and so for that reason did not require the approval of the State Comptroller. Consequently the decisions in Marquart v. Harris County and White v. McGill are not in point.

In our opinion subparagraph 2 of paragraph 1 of the contract is not invalid so as to vitiate the whole. It reads as follows:

"Analyze and review the permanent record card system heretofore compiled by First Party, so as to bring appraisals thereon to current condition as of January 1, 1959, adding (due to the extraordinary growth of Galveston County during the period of operations of First Party therein) all new properities, necessitated by construction and changes in ownership as of January 1, 1959, thereby supplying to Second Party permanent record cards for each lot or tract of land, showing its description and location, together with a diagram of all improvements located on each lot or tract of land, showing the square or cubic feet in each building, the cost per square or cubic foot to reproduce these buildings, the depreciated value, taking into consideration the age, economic, and obsolescent features. The card will show the dimensions of the tract of land, the unit front foot price on

lots and acreage values on tracts of all real property located in Galveston County, Texas, a copy of such card, marked Exhibit 'A', being attached hereto and made a part hereof."

The duties imposed upon Pritchard & Abbott by that subparagraph are incidental to and in aid of the only purpose and objective of the contract, namely: "So that all properties may be properly valued for the purpose of taxation and values thereof equalized." If the Commissioners Court is authorized to contract for and on behalf of the County for expert assistance in arriving at correct property appraisals to be of any substantial benefit, must be supplied to the County in such form that they may be readily accessible to include new construction and changes in ownership and other necessary and detailed information. In summary that is all that the subparagraph provides. It is not a "tax ferret" contract nor does it purport to furnish any information that would not be in aid of the Equalization Board in the performance of its duties. This contract would not be rendered void merely because this information is placed in a permanent form so that it may be used by the Board for the current year and in the future as well.

■ We are of the opinion that subparagraph 2 does not provide for such a "system for assessors" as contemplated by Article 7264a so as to require the joinder of the State Comptroller in the contract of employment of Pritchard and Abbott in this case, This Article mainly has to do with the adjustment and collection of delinquent taxes, Section 1 thereof reading as follows:

"It is hereby declared the Policy of the State to adjust delinquent taxes, correct errors, to eliminate conflicts in surveys of land, and to collect the delinquent, occupation, franchise and Ad Valorem Taxes, in order to clear this State of such taxes, errors and conflicts at the earliest date possible, and to provide a system for assessors, in order to eliminate the numerous errors that now appear on the tax rolls each recurring year."

Section 2 of the Article provides for meeting the expense of the collection of delinquent taxes. It also provides that the cost of installing "the tax or plat system" shall not exceed 15% of the delinquent taxes collected. Section 4 reads in part: "This Act is not intended to change any law now in effect regarding the collection of delinquent taxes, but to be an aid to the officials in the discharge of their duties, * * *." There is nothing in the

contract to indicate that the information furnished and set down on the record card is for the benefit of the assessor or to be turned over to him for his use. To the contrary, the services and cards are to be supplied to the county. Moreover, paragraph 4 of the contract recites in part, "and it being necessary to maintain and correct the basic records herein provided for on a current basis, in order that the same may furnish a reliable guide in the equalization of all classes of properties for tax purposes in Galveston County." The system provided for in Article 7264a is for the stated purpose of eliminating "the numerous errors that now appear on the tax rolls each recurring year." Also, the Article provides that this "tax or plat system" may be installed by any county to clear up errors, conflicts, and unknown owners and paid for by a percentage of the delinquent taxes collected not to exceed 15 percent. The character of the system is also indicated by the language used in the emergency clause by which this Article was enacted as follows:

"The fact that officials have let state taxes become delinquent to the amount of approximately twenty million dollars, most of which can be collected by adjustment and CORRECTION OF ERRORS, and the further fact that counties where land conflicts cause millions of dollars of property to appear on the tax rolls does not exist, WHICH FACTS show the necessity for a tax system, and the further fact that the state and counties are in need of their money, create an emergency and a public necessity exists requiring the suspension of the Constitutional Rule * * * " Laws 1931, 42nd Legislature, p. 384, ch. 229, Section 5.

Furthermore, subparagraph 2 of paragraph 1 of the contract did not impose upon Pritchard and Abbott the obligation to install "a tax or plat system," but to only analyze and review the record card system theretofore compiled and make such corrections and additions as might be necessary.

The information to be furnished and put on record cards by Pritchard and Abbott was concerned wholly with appraisals of the value of real properties and furnishing data in support of those appraisals. It was not a plat system as described in Section 2 of the Article which would ordinarily indicate a series of maps of the county.

The respondents argue that even if the Commissioners Court had the authority to make the contract in question, nevertheless

the contract cannot be upheld because the district court in the exercise of its "general supervisory control" over the Commissioners Court has struck it down, and that should end the matter. Section 8, Article V of the Constitution does provide that "The district court shall have appellant jurisdiction and general supervisory control over the County Commissioners Court with such exceptions and under such regulations as may be prescribed by law; * * *." This provision has never been construed by the courts to mean that the district court is empowered to superintend the deliberations and decisions of that body or to substitute its judgment for that of the Commissioners Court in determining what is best, proper and advantageous. Possibly the Legislature might enact "such exceptions" and "such regulations" as would clothe the district court with that power but it has not seen fit to do so.

■  In Haverbekken v. Hale, 109 Tex. 106, 204 S.W. 1162, in considering the extent of control given to the district court by that section of the Constitution we said:

"* * * The power of the District Court to supervise the proceedings of the Commissioners' Court here involved gave the injunction suit the character of a direct attack upon those proceedings rather than a collateral one. Crawford v. McDonald, 88 Tex. 626, 33 S.W. 325. This permitted a full inquiry for the purpose of seeing whether throughout the proceedings the Court had complied with the law, unhindered by any presumptions ordinarily indulged in a collateral attack upon a judgment of a court of general jurisdiction. Not otherwise could the District Court supervise and control its action."

So that the power of supervision is limited to a determination as to whether or not the Commissioners Court has proceeded according to law or acted arbitrarily or abused its discretion. In this case the only question before the district court and the only one here is whether or not the Commissioners Court in entering into this contract acted within its lawful authority. We are not concerned with the propriety of that action nor was the district court. See also Stovall v. Shivers, 129 Tex. 256, 103 S.W. 2d 363.

Being therefore of the opinion that the contract is not ultra vires the powers of the Commissioners Court but lies within the scope of its authority, the judgments of the trial court and of

the Court of Civil Appeals are reversed and judgment here rendered denying all of the relief sought by the respondents in the trial court.

CALVERT, Chief Justice, (dissenting).

The net effect of my disagreement with the majority is probably more philosophical than real as it affects petitioners' right of recovery, but it is more real than philosophical as it bears on the legal principles involved. I would hold the contract invalid because subparagraph 2 of paragraph I of the contract is ultra vires the powers of the commissioners court, but would permit recovery by petitioners of the reasonable value of services and materials furnished for which the commissioners court had power to contract.

One of the crucial issues in the case is whether the contract, or any part of it, is ultra vires the powers of the commissioners court. A proper resolution of that issue does not turn on whether the commissioners court by contracting for the services of petitioners has usurped the constitutional and statutory power and duties of the assessor and collector of taxes. The contract for services and materials may not at all usurp the powers and duties of the tax assessor but yet may be ultra vires.

There can be no question but that if any part of the contract is invalid the entire contract must fall. The contract provides for payment to petitioners of $86,500.00, in installments, for all services and materials furnished. The first installment of $26,500.00 has been paid. The contract is indivisible. There is no basis on which a certain portion of the consideration can be allocated to services and materials for which the commissioners court has power to contract and a certain portion to services and materials for which the court has no power to contract. That being true, if sub-paragraph 2 of paragraph I of the contract is ultra vires, the contract is invalid in its entirety. Sylvan Sanders Co. v. Scurry County, Tex. Civ. App., 77 S.W. 2d 709, 710, writ refused; 13 Tex. Jur. 2d 428-431, Contracts, § 213; 12 Am. Jur. 739-740, Contracts, § 221.

A commissioners court is not a court of general or unlimited jurisdiction. By the provisions of Section 18 of Article V of the State Constitution its "powers and jurisdiction over all county business" is only such "as is conferred by this Constitution and the laws of the State." Moreover, its powers when act-

ing as a board of equalization are only those "The Legislature shall provide." Section 18, Article VIII, Constitution of Texas. Thus the power of a commissioners court to enter into a particular contract must be expressly given by statute or it must be implied as reasonably necessary to a discharge of duties imposed on the court by law; otherwise, the contract is ultra vires. Clark v. Finley, 93 Tex. 171, 54 S.W. 343, 346-347; Mills County v. Lampasas County, 90 Tex. 603, 40 S.W. 403, 404; Childress County v. State, 127 Tex. 343, 92 S.W. 2d 1011, 1016; Canales v. Laughlin, 147 Tex. 169, 214 S.W. 2d 451, 453; 15 Tex. Jur. 2d 261, 317, Counties, §§ 35, 92.

The services which were to be performed by petitioners under sub-paragraph 2 were to

"Analyze and review the permanent record card system heretofore compiled by First Party, so as to bring appraisals thereon to current condition as of January 1, 1959, adding (due to the extraordinary growth of Galveston County during the period of operations of First Party therein) all new properities, necessitated by construction and changes in ownership as of January 1, 1959, thereby supplying to Second Party permanent record cards for each lot or tract of land, * *."

The cards were to contain certain descriptive information.

I can find no statute expressly authorizing a commissioners court to contract for the type of services provided for in sub-paragraph 2. I do not understand the majority to sustain the validity of that portion of the contract on the basis of express authority. The only questions which remain, therefore, are whether that portion of the contract is impliedly authorized and whether it was executed pursuant to the court's implied power. I suggest that on the basis of a careful analysis of the record before us both questions should be answered in the negative.

I quite agree that there is no ambiguity in the provisions of sub-paragraph 2 relating to the type of services to be performed by petitioners. On the other hand, there is much ambiguity in the other matters to which the sub-paragraph refers. What was the "permanent record card system" therefore compiled by First Party? For whom and for what purpose was it compiled? When were the cards to be completed and delivered? These questions

must be answered before we can say that the further services relating to the card system were reasonably necessary to a discharge by the commissioners court of its duties as a board of equalization and that the court, therefore, had implied power to contract for such services.

The testimony in the record discloses that the Commissioners Court of Galveston County entered into a contract with petitioners about 1955 to prepare a permanent record card system containing substantially the same information provided for in subparagraph 2. The 1955 contract was not introduced in evidence, but the testimony of the Tax Assessor and Collector of Galveston County and his chief deputy, and of Truett Pritchard and one of petitioners' employees leaves the following matters uncontroverted: A separate card was to be prepared for each lot, tract or parcel of land listed on the assessor's rolls; no card was to be prepared for any lot or tract not appearing on the rolls; there would be a total of approximately 100,000 cards; Pritchard and Abbott were to provide 48 steel cabinets for the tax assessor's office, capable of containing 120,000 cards, in which the cards were to be filed; the cabinets were delivered to the tax assessor's office in 1959; when the cards were completed they were to be delivered to the tax assessor for filing in the steel cabinets; when so delivered and filed *they were to become a permanent record in the assessor's office;* they were to be used by the tax assessor in appraising property as a basis for figuring assessed valuations to be presented to future boards of equalization; the cards had not been completed when the contract of 1959 was executed; the parties to the 1959 contract did not contemplate that the cards would be completed or available until after the board of equalization had concluded its work for the year of 1959; the cards had not been completed when this suit was filed in October, 1959, and had not been delivered when this case was tried. A sample card is in the record.

From the undisputed testimony here summarized it is quite clear that the "permanent record card system" referred to in subparagraph 2 was a new type of permanent property record to be constructed for the office of the tax assessor, primarily for his use in the discharge of his statutory duties. That the system may have been of some incidental value to the board of equalization in reviewing assessments made by the assessor does not alter that fact. All permanent records in the assessor's office are of some value to the board of equalization. While the validity of the 1955 contract is not directly in issue here, its validity

must be determined, incidentally, in deciding whether the commissioners court was authorized to contract for further services in reviewing and revising the work product of that contract.

The statutes expressly provide the types of permanent records which must, and may, be provided for a tax assessor to aid him in discharging his official duties. The commissioners court must furnish the assessor with books in which he must keep a record of all surveys of land in the county and in which he must show by whom the land is rendered and the value thereof. Arts. 7195 and 7196, V.A.T.S. The court must also furnish the assessor with books in which he is required to make and keep a record of all blocks and subdivisions of cities, towns and villages, showing the owners and values thereof. Art. 7197, V.A.T.S. The statutes referred to are mandatory in prescribing the exact form of these records. In addition, a commissioners court may contract, with joinder of the State Comptroller, for preparation of "a tax or plat system." Art. 7264a, V.A.T.S. No other types of property records or system are authorized by law. Petitioners insist, and the majority have held, that the "permanent record card system" which they were to construct and deliver to the Tax Assessor and Collector of Galveston County is not the type of "tax or plat system" authorized by Art. 7264a. They must so contend, for otherwise their contract would be void since approval by the State Comptroller is not even suggested. For purposes of this dissent I shall assume the majority are correct in sustaining that contention. The net result is that the Commissioners Court of Galveston County contracted with petitioners in 1955 for services in the construction of an extensive type of permanent property record for the tax assessor's office which is unauthorized by law, either expressly or impliedly. That the type of record to be prepared might be far better, and far more useful, than any authorized by law, does not make the contract legal. The power to determine what types of permanent property records shall be furnished to and kept by tax assessors is conferred by the Constitution on the Legislature and not on commissioners courts or on this court. If the contract of 1955 is not the type of contract contemplated by Art. 7264a, it is clearly ultra vires the powers of the commissioners court, and subparagraph 2 of paragraph I providing for further services in the completion of the 1955 contract, unapproved by the State Comptroller, is likewise ultra vires. The rights of the parties under the 1955 contract are not in issue here and need not and cannot be decided.

The foregoing conclusion does not mean that petitioners should be denied a recovery for their services for which the commissioners court had power to contract. The trial court refused to admit evidence of the reasonable value of those services, and that court and the Court of Civil Appeals held, as a matter of law, that petitioners cannot recover on quantum meruit on their cross-action for any of the services and materials furnished. In my opinion this holding is erroneous.

The parties agree that there can be no recovery on quantum meruit for services or materials furnished a municipal corporation under a contract which the corporation has no power to make. See Nunn-Warren Pub. Co. v. Hutchinson County, Tex. Civ. App., 45 S.W. 2d 651, writ refused; Aldrich v. Dallas County, Tex. Civ. App., 167 S.W. 2d 560, writ dismissed; Noel v. City of San Antonio, Tex. Civ. App., 33 S.W. 263, writ refused; Baldwin v. Travis County, Tex. Civ. App., 88 S.W. 480, writ refused. They also agree that a recovery may be had on quantum meruit for services or materials furnished a municipal corporation under a contract which the corporation has power to make but which is invalid for other reasons. See City of Houston v. Finn, 139 Tex. 111, 161 S.W. 2d 776, West Audit Co. v. Yoakum County, Tex. Com. App., 35 S.W. 2d 404; Sluder v. City of San Antonio, Tex. Com. App., 2 S.W. 2d 841; City of San Antonio v. French, 80 Tex. 575, 16 S.W. 440. No cases have been cited by the parties, and I have found none, dealing directly with the right to recover on quantum meruit for services and materials furnished for which a municipal corporation has power to contract when the contract therefor also requires the furnishing of services and materials for which the corporation has no power to contract.

Petitioners do cite Galveston County v. Ducie, 91 Tex. 665, 45 S.W. 798, as authority. That case involved the right of a physician to recover damages for breach by Galveston County of a two-year contract to render medical aid to prisoners and paupers and attend inquests for an agreed compensation of $80.00 per month. In answer to a certified question we held that the county had the power to make the contract for services to prisoners and paupers but had no power to contract for the physician's attendance at inquests; and we further answered and held that the physician could recover damages for breach of the contract less what his services would be reasonably worth for attending inquests.

Whatever may otherwise be said from an analysis of Galveston County v. Ducie, it must be admitted that a just result was reached. All of the cases hereinbefore cited for the proposition that one may recover for services or materials furnished to a municipal corporation under an invalid contract which it has power to make, rest their holding in equity and justice. By way of example, this court said in City of Houston v. Finn, 161 S.W. 2d 776, 777: "In the instances under discussion the illegal agreement is not enforced as a contract. To the contrary, the illegal agreement as such is not enforced at all. The contract that is enforced is one that the law implies, because justice demands that a municipality shall not be permitted to receive and retain the benefits of an agreement without paying the reasonable value of such benefits."

In the instant case Galveston County had the power to contract for all of the services and materials to be furnished save those required by sub-paragraph 2. But for the inclusion of that subparagraph the contract would not be void. All of the services and materials required under all other parts of the contract have been furnished and Galveston County has had the benefit of them. Justice requires that the county should pay for them. Petitioners should be permitted to recover the reasonable value of all services rendered and materials furnished under all of the provisions of the contract, not to exceed the contract consideration of $86,500.00, less the reasonable value of services to be performed under sub-paragraph 2 and less the sum of $26,500.00 heretofore paid.

The judgments of the trial court and the Court of Civil Appeals should be reversed and the cause should be remanded to the trial court for further proceedings consistent with this opinion.

Associate Justices Smith and Norvell join in this dissent.